Todd M. Friedman (SBN 216752)
Meghan E. George (SBN 274525)
Adrian R. Bacon (SBN 280332)
LAW OFFICES OF TODD M. FRIEDMAN, P.C.
21031 Ventura Blvd, Suite 340
Woodland Hills, CA 91364
Phone: 323-306-4234
Fax: 866-633-0228
tfriedman@toddflaw.com
mgeorge@toddflaw.com
abacon@toddflaw.com
*Attorneys for Plaintiff,*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BRITTNEY HILDEBRAND**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>**SOUTHWEST SOCCER CLUB TOURNAMENTS; SOUTHWEST SOCCER CLUB, INC.**; DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 8:21-cv-01871<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF:**<br><br>1. NEGLIGENT VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT [47 U.S.C. §227 ET SEQ.]<br>2. WILLFUL VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT [47 U.S.C. §227 ET SEQ.]<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, BRITTNEY HILDEBRAND ("Plaintiff"), individually and all others similarly situated, alleges the following upon information and belief based upon personal knowledge:

## NATURE OF THE CASE

1. Plaintiff brings this action individually and on behalf of all others similarly situated seeking damages and any other available legal or equitable

remedies resulting from the illegal actions of SOUTHWEST SOCCER CLUB TOURNAMENTS and SOUTHWEST SOCCER CLUB, INC., ("Defendants"), in negligently, knowingly, and/or willfully contacting Plaintiff on Plaintiff's cellular telephone in violation of the Telephone Consumer Protection Act, *47. U.S.C. § 227 et seq*. ("TCPA"), thereby invading Plaintiff's privacy.

2. The TCPA was designed to prevent calls and messages like the ones described within this complaint, and to protect the privacy of citizens like Plaintiff. "Voluminous consumer complaints about abuses of telephone technology – for example, computerized calls dispatched to private homes – prompted Congress to pass the TCPA." *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012).

3. In enacting the TCPA, Congress intended to give consumers a choice as to how creditors and telemarketers may call them, and made specific findings that "[t]echnologies that might allow consumers to avoid receiving such calls and messages are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer.   TCPA, Pub.L. No. 102–243, § 11. Toward this end, Congress found that

> [b]anning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

*Id*. at § 12; see also *Martin v. Leading Edge Recovery Solutions, LLC*, 2012 WL 3292838, at* 4 (N.D.Ill. Aug. 10, 2012) (citing Congressional findings on TCPA's purpose).

4. Congress also specifically found that "the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call…." Id. at §§ 12-13. See also, *Mims*, 132 S. Ct. at 744.

5. In a recent decision, the Supreme Court interpreted the term "automatic telephone dialing system" and held that "[t]o qualify as an 'automatic telephone dialing system,' a device must have the capacity either to store a telephone number using a random or sequential generator *or* to produce a telephone number using a random or sequential number generator." *Facebook, Inc. v. Duguid*, 141 S.Ct. 1163 (2021) (emphasis added).

6. In *Duguid*, the Supreme Court provided an example of such systems, stating: "For instance, an autodialer might use a random number generator to determine the order in which to pick phone numbers from a preproduced list. It would then store those numbers to be dialed at a later time." *Id.* at 1171-72 fn. 7.

7. Further, both *Duguid* and the legislative history of the TCPA are clear that the original focus on prerecorded voice technology prohibition was the fact that such communications involved agentless calls, not on the question of whether a literal voice was used during those agentless calls. *See* Hearing Before the Subcommittee on Communications of the Committee on Commerce, Science and Transportation, United States Senate One Hundred Second Congress First Session July 24, 1992, Testimony of Robert Bulmash and Steve Hamm at pg 11; 7 FCC Rcd. 8752 (F.C.C. September 17, 1992).

8. The Sixth Circuit has also recognized this distinction: "Congress drew an explicit distinction between 'automated telephone calls that deliver an artificial or prerecorded voice message' on the one hand and 'calls place by 'live' persons' on the other." *Ashland Hosp. Corp. v. Serv. Employees Int'l Union, Dist. 1199 WV/KY/OH*, 708 F.3d 737,743 (6th Cir. 2013).

9. Similarly, the FTC has observed that "prerecorded calls are by their very nature one-sided conversations, and if there is no opportunity for consumers to ask questions, offers may not be sufficiently clear for consumers to make informed choices before pressing a button or saying yes to make a purchase." 73 FR 51164-01, 51167 (Aug. 29, 2008).

## JURISDICTION & VENUE

10. Jurisdiction is proper under *28 U.S.C. § 1331* because Plaintiff alleges claims under the TCPA, a federal law.

11. Venue is proper in the United States District Court for the Central District of California pursuant to *18 U.S.C. 1391(b)* and *18 U.S.C. § 1441(a)* because Defendant is subject to personal jurisdiction in the County of Orange, State of California.

## PARTIES

12. Plaintiff, BRITTNEY HILDEBRAND ("Plaintiff"), is a natural person residing in Orange County of the state of California and is a "person" as defined by *47 U.S.C. § 153 (10)*.

13. Defendants, SOUTHWEST SOCCER CLUB TOURNAMENTS and SOUTHWEST SOCCER CLUB, INC. ("Defendants"), are companies that own and operate a soccer tournament in Southern California and are a "persons" as defined by *47 U.S.C. § 153 (10)*.

14. The above named Defendants, and their subsidiaries and agents, are collectively referred to as "Defendants." The true names and capacities of the Defendants sued herein as DOE DEFENDANTS 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. Plaintiff will seek leave of Court to amend the Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

15. Plaintiff is informed and believes that at all relevant times, each and every Defendant was acting as an agent and/or employee of each of the other Defendants and was acting within the course and scope of said agency and/or employment with the full knowledge and consent of each of the other Defendants.

Plaintiff is informed and believes that each of the acts and/or omissions complained of herein was made known to, and ratified by, each of the other Defendants.

## FACTUAL ALLEGATIONS

16. Beginning on or around October 19, 2021, Defendants contacted Plaintiff on her cellular telephone, (562) 338-6346, in an effort to sell or solicit their services, via both phone calls and text messages.

17. Defendants used an "automatic telephone dialing system", as defined by *47 U.S.C. § 227(a)(1)* to place their call to Plaintiff seeking to sell or solicit their business services During this call, Defendants utilized an "artificial or prerecorded voice" as prohibited by 47 U.S.C. § 227(b)(1)(A).

18. Defendants placed the call to Plaintiff from the phone number known to be owned and operated by Defendants, (877) 333-9336.

19. Defendants' call constituted a call that was not for emergency purposes as defined by *47 U.S.C. § 227(b)(1)(A)*.

20. Defendants' call was placed to telephone number assigned to a cellular telephone service for which Plaintiff incurs a charge for incoming calls pursuant to *47 U.S.C. § 227(b)(1)*.

21. Plaintiff is not a customer of Defendants' services and has never provided any personal information, including her cellular telephone number, to Defendant for any purpose whatsoever. Accordingly, Defendant never received Plaintiff's "prior express consent" to receive calls using an automatic telephone dialing system or an artificial or prerecorded voice on her cellular telephone pursuant to *47 U.S.C. § 227(b)(1)(A)*.

22. In addition to the phone call Plaintiff received from Defendants, on or about October 22, 2021, Defendants sent multiple automated marketing text messages to Plaintiff's cellular telephone number from a phone number confirmed to belong to Defendants, (855) 615-2950, which read:

   a) "SWSC Thanksgiving College Showcase 2021 held in Temecula.

        Free college seminar. College coaches attending.

        www.southwestsc.org. Text S Te

        Text STOP to quit"

and

        b) "SWSC Thanksgiving College Showcase NOV 27 and 28 a 2 days event. Deadline NOV 10..Great competition .

        www.southwestsc.org Text S Te

        Text STOP to quit"

23. Annoyed by the unwanted advertising material, Plaintiff responded, "Who is this" "Leave me alone" and "Stop."

24. Defendants sent an immediate computer-generated responsive text message to Plaintiff that read:

        "NETWORK MSG: You replied the word "stop" which blocks all texts sent from this number.

        Text back 'unstop' to receive messages again"

25. Defendants did not have Plaintiff's prior express consent.

26. Based on the content and format of these text messages, Plaintiff alleges, upon information and belief, that they were sent via Defendants' SMS Blasting Platform, Call Multiplier (https://www.callmultiplier.com), i.e., an "automatic telephone dialing system," ("ATDS") as defined by 47 U.S.C. § 227 (a)(1) as prohibited by 47 U.S.C. § 227 (b)(1)(A).

27. Upon information and belief, Call Multiplier has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator.

28. The text messages sent to Plaintiff's cellular telephone were not sent by a live agent and thus created a one-sided conversation in which Plaintiff could

not receive a response to her questions and/or concerns. The text messages were also sent in an automated fashion as a result of computerized campaigns that were pre-programmed in advance to send messages out to large groups of consumers all at once, either sequentially or via algorithmic dialing, i.e. in an automated fashion by a computer.  By algorithmic dialing, Plaintiff means that the dialing platform is programmed in a manner which utilizes a random or sequential number generator in order to dial a stored list of numbers.

29. The texting platform uses an algorithm whereby a random or sequential number generator, similar to a randomization formula or sequential dialing formula, selects which number to dial from the stored list of numbers, and sequences those numbers in order to automatically dial the numbers and send our text messages en masse. Thus, a random or sequential number generator is used both to store the numbers, and to produce the stored numbers from the list, via the campaign, to the dialing platform itself.

30. Undersigned counsel have studied the code used to program other similarly-functioning autodialers in the past, with the assistance of software engineers fluent in Java, and have found that such autodialers, when used in automated mode, execute code that relies upon random or sequential number generation to both store and produce numbers to be dialed by the dialer. For instance, a common "parser" used in SMS blasters integrates the following open-source Apache code into an autodialing dialing platform:

```
730        if (!this.recordList.isEmpty()) {
731          this.recordNumber++;
732          final String comment = sb == null ? null : sb.toString();
733          result=newCSVRecord(this,this.recordList.toArray(Constants.EMPTY_STRING_ARRAY), comment,
734            this.recordNumber, startCharPosition);
735        }
```

CLASS ACTION COMPLAINT
-7-

```
736         return result;
737     }
```

31. These lines of code, and specifically the "++" in line 731, represent an operator token that generates sequential numbers as part of a loop. This loop is used to select which number from the CSV file, will be dialed, and produce that number to the dialer using a CSV parser. Such programs can dial thousands of consumers in mere seconds, without any human intervention whatsoever. The sequential number generator in the code above is executed in the process of mass predictive dialing. The program cannot function, and therefore cannot dial any phone numbers at all, without this sequential number generator.

32. Plaintiff alleges that Defendants used a dialing system with the similar capacity to autodial numbers as shown above. Functionally, that is simply how text blasting systems work. They rely on random or sequential number generators to instruct the data set to produce telephone numbers to the dialer. Without this key component, a dialing campaign would require an agent to manually place the call, through organic decision making, or as was the case in *Duguid v. Facebook*, through some other organic one-to-one triggering event that instructs the dialer to place the call.

33. Plaintiff will not be able to demonstrate whether the code for Defendants' dialing system contains such random or sequential number generators without doing discovery and obtaining the code for the dialing platform. Plaintiff makes these allegations on information and belief based on the volume of communications she received, the fact that there was a pause at the beginning of the call, and the fact that the calls were spoofed, which are all indicia that they were autodialed with a predictive dialer.

34. The problem with these known realities is that because Plaintiff does not and could not ever have access to Defendants' proprietary code, which is in its sole possession, Plaintiff cannot allege with any more specificity that the system's

code contains such language. However, based on detailed discussions with experts and years of litigation and expertise surrounding such technology, Plaintiff, and her counsel, have a legitimate and sufficient good faith basis to make these allegations, and assert that if the system is a traditional text blasting platform as alleged, *then it will have some variation on the coding that is described herein*, which will undoubtedly include either random or sequential number generators that are being executed in conjunction with storing and dialing the telephone numbers, including the dialing of Plaintiff's phone number.

35. Additionally, Defendants spoofed the number from which it texted Plaintiff which is indicative of an automated system that automatically masks the number from which the text messages are placed.

36. The following is description, in plain English, of an automated dialer typically operates: A dialer operator accesses a database of consumer contact information, which is typically contained in a text delimited file, either in a CSV file, text file, Microsoft Excel, or Microsoft Access file. In essence, this is a spreadsheet, containing rows and columns of data, which includes telephone numbers. The operator will load this data set into the dialing platform. The dialing system will cut the data set into individual lines, unique to each telephone number with an assigned row using a parser. Parsers will separate the data, and then index the telephone numbers using either random or sequential number generators, but most commonly sequential number generators. The program will then store the telephone number using that number generator. The data is stored in temporary cache or RAM memory, to be accessed by the dialer platform thereafter. A random or sequential number generator is programmed to select and produce, automatically, without any organic triggering event by a human being, the telephone numbers, i.e. in accessing them from storage. Once the number generator corresponds to a matching number in the stored list, that telephone number will be "produced" from storage to the dialer, which then automatically

dials that telephone number. Thus, predictive dialers have the capacity to use random or sequential number generators to both store and produce the telephone number to be automatically dialed by the dialing program, without human intervention.

37. To illustrate this using a real-world example that was provided to undersigned counsel by a software engineer who is fluent in Java and has reviewed dialer code, imagine a list of numbers as a lengthy sheet of lined notebook paper. A parser cuts this into strips, and stores it in a paper tray, which is attached to a scanner. Each strip of paper has a row number, and a telephone number. The scanner uses a program to generate numbers, either sequentially or randomly. That generator is hooked to the paper feed, which instructs the scanner to match the generated number, to the corresponding strip of paper in the tray, and then scan that telephone number from the stored list, through the scanner, and out the other side, at which time the scanner is dialing the telephone number on that strip of paper. Now imagine a scanner that accomplishes this with a tray containing thousands of pages of paper in the blink of an eye. Once the tray is empty, the dialing campaign is complete.

38. No human intervention whatsoever exists in this process other than pre-programming the parameters of the campaign, i.e. by inputting the numbers, and selecting the times/dates that the campaign will take place.

39. In Merriam Webster's Dictionary, "voice" is defined as "an instrument or medium of expression." It defines "artificial" as "humanly contrived…often on a natural model : MAN-MADE" and "lacking in natural or spontaneous quality."

40. The messages sent to Plaintiff by Defendants using the SMS blasting platform employed a text message as an instrument or medium of expression to deliver an automatic message drafted in advance of being sent, i.e. that of an SMS message, to convey a telemarketing communication to Plaintiff. SMS blasting

platforms are man-made humanly contrived programs which allow companies to blast out such messages via non-spontaneous methods, i.e. automated methods similar to that of an assembly line in a factory. Such SMS blasting devices are incapable of spontaneity, as they must be programmed by the operator to automatically send messages out, *en masse*, pursuant to preprogrammed parameters.

41. Accordingly, Defendants' messages utilized an "artificial voice" or "prerecorded voice" as prohibited by 47 U.S.C. § 227(b)(1)(A).

42. In Merriam Webster's Dictionary, "prerecorded" is defined as "recorded in advance." "Recorded" is defined as "to set down in writing." The text message sent to Plaintiff's cellular telephone via an SMS blasting platform was set down in writing in advance by Defendants, whose employees wrote out the standard automated messages that were to be sent to Plaintiff and other class members, and by way of preprogrammed SMS blasting, entered the prerecorded message into the SMS Blasting platform, and thereafter sent these messages pursuant to scheduled blasts that were programmed by Defendants. Thus, Defendants employed a text message as an instrument or medium of expression to deliver a prerecorded message drafted in advance of being sent.

43. Thus, Defendants' messages utilized a "prerecorded voice" as prohibited by 47 U.S.C. § 227(b)(1)(A).

44. The telephone number that Defendants, or their agent texted were assigned to a cellular telephone service for which Plaintiff incur charges for incoming texts pursuant to 47 U.S.C. § 227 (b)(1).

45. These text messages constituted calls that were not for emergency purposes as defined by 47 U.S.C. § 227 (b)(1)(A)(i).

46. Plaintiff was never a customer of Defendant and never provided her cellular telephone number to Defendant for any reason whatsoever. Accordingly,

Defendant and their agents never received Plaintiff's prior express consent to receive unsolicited text messages, pursuant to 47 U.S.C. § 227 (b)(1)(A).

## CLASS ALLEGATIONS

47. Plaintiff brings this action on behalf of herself and all others similarly situated, as a member of the proposed class (hereafter "The Class") defined as follows:

> All persons within the United States who received any telephone calls or text messages from Defendants to said person's cellular telephone made through the use of any automatic telephone dialing system or an artificial or prerecorded voice and such person had not previously consented to receiving such calls within the four years prior to the filing of this Complaint, through the date of class certification.

48. Plaintiff represents, and is a member of, The Class, consisting of All persons within the United States who received any telephone calls or text messages from Defendants to said person's cellular telephone made through the use of any automatic telephone dialing system or an artificial or prerecorded voice and such person had not previously not provided their cellular telephone number to Defendants within the four years prior to the filing of this Complaint.

49. Defendants, their employees and agents are excluded from The Class. Plaintiff does not know the number of members in The Class, but believes the Class members number in the thousands, if not more. Thus, this matter should be certified as a Class Action to assist in the expeditious litigation of the matter.

50. The Class is so numerous that the individual joinder of all of its members is impractical. While the exact number and identities of The Class members are unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff is informed and believes and thereon alleges that

The Class includes thousands of members. Plaintiff alleges that The Class members may be ascertained by the records maintained by Defendants.

51. Plaintiff and members of The Class were harmed by the acts of Defendants in at least the following ways: Defendants illegally contacted Plaintiff and Class members via their cellular telephones thereby causing Plaintiff and Class members to incur certain charges or reduced telephone time for which Plaintiff and Class members had previously paid by having to retrieve or administer messages left by Defendants during those illegal calls, and invading the privacy of said Plaintiff and Class members.

52. Common questions of fact and law exist as to all members of The Class which predominate over any questions affecting only individual members of The Class. These common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class members, include, but are not limited to, the following:

a. Whether, within the four years prior to the filing of this Complaint, Defendant made any call or text (other than a call made for emergency purposes or made with the prior express consent of the called party) to a Class member using any automatic telephone dialing system or any artificial or prerecorded voice to any telephone number assigned to a cellular telephone service;
b. Whether Plaintiff and the Class members were damages thereby, and the extent of damages for such violation; and
c. Whether Defendants should be enjoined from engaging in such conduct in the future.

53. As a person that received a phone call and multiple text messages from Defendants using an automatic telephone dialing system or an artificial or prerecorded voice, without Plaintiff's prior express consent, Plaintiff is asserting claims that are typical of The Class.

54. Plaintiff will fairly and adequately protect the interests of the members

of The Class. Plaintiff has retained attorneys experienced in the prosecution of class actions.

55. A class action is superior to other available methods of fair and efficient adjudication of this controversy, since individual litigation of the claims of all Class members is impracticable. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous issues would proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same complex factual issues. By contrast, the conduct of this action as a class action presents fewer management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each Class member.

56. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other Class members not parties to such adjudications or that would substantially impair or impede the ability of such non-party Class members to protect their interests.

57. Defendants have acted or refused to act in respects generally applicable to The Class, thereby making appropriate final and injunctive relief with regard to the members of the California Class as a whole.

### FIRST CAUSE OF ACTION
**Negligent Violations of the Telephone Consumer Protection Act**
**47 U.S.C. §227 et seq.**

58. Plaintiff repeats and incorporates by reference into this cause of action the allegations set forth above at Paragraphs 1-57.

59. The foregoing acts and omissions of Defendants constitute numerous and multiple negligent violations of the TCPA, including but not limited to each

and every one of the above cited provisions of *47 U.S.C. § 227 et seq*.

60. As a result of Defendants' negligent violations of *47 U.S.C. § 227 et seq.*, Plaintiff and the Class Members are entitled an award of $500.00 in statutory damages, for each and every violation, pursuant to *47 U.S.C. § 227(b)(3)(B)*.

61. Plaintiff and the Class members are also entitled to and seek injunctive relief prohibiting such conduct in the future.

### SECOND CAUSE OF ACTION
**Knowing and/or Willful Violations of the Telephone Consumer Protection Act**
**47 U.S.C. §227 et seq.**

62. Plaintiff repeats and incorporates by reference into this cause of action the allegations set forth above at Paragraphs 1-61.

63. The foregoing acts and omissions of Defendants constitute numerous and multiple knowing and/or willful violations of the TCPA, including but not limited to each and every one of the above cited provisions of *47 U.S.C. § 227 et seq*.

64. As a result of Defendants' knowing and/or willful violations of *47 U.S.C. § 227 et seq.*, Plaintiff and the Class members are entitled an award of $1,500.00 in statutory damages, for each and every violation, pursuant to *47 U.S.C. § 227(b)(3)(B)* and *47 U.S.C. § 227(b)(3)(C)*.

65. Plaintiff and the Class members are also entitled to and seek injunctive relief prohibiting such conduct in the future.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants for the following:

### FIRST CAUSE OF ACTION
**Negligent Violations of the Telephone Consumer Protection Act**
**47 U.S.C. §227 et seq.**

- As a result of Defendants' negligent violations of *47 U.S.C. §227(b)(1),* Plaintiff and the Class members are entitled to and request $500 in statutory damages, for each and every violation, pursuant to *47 U.S.C. 227(b)(3)(B)*; and

- Any and all other relief that the Court deems just and proper.

## SECOND CAUSE OF ACTION
**Knowing and/or Willful Violations of the Telephone Consumer Protection Act**
**47 U.S.C. §227 et seq.**

- As a result of Defendants' willful and/or knowing violations of *47 U.S.C. §227(b)(1)*, Plaintiff and the Class members are entitled to and request treble damages, as provided by statute, up to $1,500, for each and every violation, pursuant to *47 U.S.C. §227(b)(3)(B)* and *47 U.S.C. §227(b)(3)(C)*; and

- Any and all other relief that the Court deems just and proper.

Respectfully Submitted this 12th of November, 2021.

    LAW OFFICES OF TODD M. FRIEDMAN, P.C.

    By: /s/ Todd M. Friedman
       Todd M. Friedman
       Law Offices of Todd M. Friedman
       Attorney for Plaintiff